**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION**

WILLIAM STEVE OWENS                                        PLAINTIFF

VERSUS                        CIVIL ACTION NO. 5:04cv304-DCB-JCS

UNITED STATES OF AMERICA                                   DEFENDANT

<u>**BENCH OPINION**</u>

This matter came on for trial before the Court without a jury on August 29-30, 2006.  The evidence being closed and both sides having rested their respective cases, the Court, after due consideration of the evidence of record, makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52:

**FACTS**

William Steve Owens pled guilty to smuggling merchandise into the United States under 18 U.S.C. § 545 and was sentenced to one year and one day in prison.  Owens served his time as an inmate at the Federal Correctional Institute ("FCI") in Yazoo City, Mississippi from August 4, 2003 until June 17, 2004.  He was released early via good conduct time release.

***August 13, 2003 - August 15, 2003***

On August 13, 2003, Owens reported to FCI Nurse Beasley that he had been assaulted by another inmate approximately one hour earlier and was suffering from severe jaw pain.  Nurse Beasley referred Owens to Dr. Chambers, the Clinical Director of the FCI.

-1-

Dr. Chambers examined Owens, noticed no swelling or bruising, and prescribed Owens Torodol for his pain. (Def. Ex. 1.)  The following day, Dr. Wise, an FCI dental officer, performed Owens's "inmate intake screening."  (See Def. Ex. 2.)  During this initial screening, Owens again complained of jaw pain along with pain in the back of his head and neck.  Dr. Wise ordered a panorex x-ray of Owens.[1]  To determine whether Owens had suffered a fractured jaw, Dr. Wise instructed Owens to make medical sick call for further diagnosis and x-rays.  On August 15, 2003, Owens made sick call and was again examined by Dr. Chambers.  Owens complained of jaw pain and was diagnosed with temporomandibular joint disease ("TMJ").  Dr. Chambers prescribed Tylenol for the pain and put Owens on a soft diet, but he did not conduct any additional x-rays.  (See Def. Ex. 1.)

**August 25, 2003 - August 28, 2003**

On August 25, 2003, Owens again made sick call and stated, "My jaw still hurts bad, and the teeth don't come together like they did before."  (Def. Ex. 3.)  Due to the plaintiff's consistent complaints of pain, Dr. Callahan, the Chief Dental Officer at FCI, ordered additional x-rays.  On August 26, 2003, these additional x-rays were taken and revealed a sybcondylar fracture.  The discovery

---

[1]

A panorex x-ray does not show the patient's entire skull; rather, it reveals an image of the teeth.  Dr. Wise testified that a panorex x-ray would not show a hairline subcondylar fracture.

of the fracture prompted Drs. Callahan and Chambers to send Mr. Owens to the University Medical Center in Jackson, Mississippi for further evaluation. The attending physician at University Medical confirmed the existence of a subcondylar fracture and recommended an Intermaxillary Fixation ("IMF"), which is essentially the wiring of the mandible in its anatomically correct position. Owens refused the IMF on that occasion. (Def. Ex. 5.) The next day, Dr. Chambers consulted with Mr. Owens about the University Medical Center's findings. During Owens's consultation with Dr. Chambers on August 27, 2003, Owens changed his mind and decided he was willing to have the corrective procedure. (Def. Ex. 7.) On August 28, 2003, Owens was taken to Dr. Kevin Keen, a private oral surgeon who performed services for the Yazoo City FCI. (Def. Ex. 7.) Dr. Keen determined that the fracture had already begun to heal; therefore, he recommended a vertical ramus osteotomy[2] to correct both the broken jaw and the malocclusion that had developed due to the fracture.[3]   (See Def. Ex. 7.) Owens consented to the osteotomy. To undergo the surgery, Dr. Keen informed Dr. Chambers

---

[2]

A vertical ramus osteotomy is essentially the rebreaking and resetting of the jaw into its anatomically correct position. An osteotomy requires the patient's jaw to be wired together for two to three weeks after the surgery. (Keen Dep. 30-32.) After the wiring is removed, the patient must undergo another two to three weeks of post-operative treatment where elastic bands hold his jaw in place. Id.

[3]

The term "malocclusion" refers to an improper alignment of the teeth or a gap between the upper and lower teeth.

that Owens would need extensive post-operative care; as such, Dr. Keen recommended that Owens be transferred to a Bureau of Prisons ("BOP") Medical Facility for his recovery.

### After August 28, 2003

On September 29, 2003, one full month after Dr. Keen recommended the surgery, Dr. Chambers initiated Owens's transfer to a medical facility by filling out and filing a Bureau of Prison Form 204 ("BP 204").  The BP 204 explicitly listed the plaintiff, his condition, and the treatment he was going to receive.  On October 27, 2003, the BP 204 was denied by the medical facility without any reasons being given.  The BOP's denial, however, contained the directive to "obtain treatment locally."

More than a full month passed before the FCI acted on the BOP's directive to provide Owens with local treatment.  On December 3, 2003, the plaintiff's fractured jaw was examined by Dr. Thomas Ligon, who was the new oral surgeon servicing the FCI.[4]  Dr. Ligon found that the fracture had healed, but Owens still had a small malocclusion of one millimeter.  Somehow, Dr. Ligon's findings and recommendations did not arrive at the FCI.[5]  Over a month later on January 13, 2004, Dr. Callahan contacted Dr. Ligon and requested

---

[4]

Dr. Ligon replaced Dr. Keen as the FCI's contracting oral surgeon sometime between August 28, 2003 and December 3, 2003.

[5]

No testimony was provided concerning why this information was not immediately given to the FCI.

his recommendations.  Dr. Ligon provided three options for fixing the plaintiff's malocclusion: (1) an occlusal adjustment,[6] (2) orthodontics, and (3) a vertical ramus osteotomy.  Dr. Ligon further stated that the osteomoty was the "poorest option" for such a small malocclusion and could actually make the plaintiff's malocclusion worse.  (Def. Ex. 10.)  In fact, Dr. Ligon refused to perform an osteotomy on Mr. Owens.  (Ligon dep. 28.)

On January 15, 2004, Dr. Callahan offered Owens an occlusal adjustment, but Owens refused and demanded surgery.  Between January 15, 2004 and his release in June of 2004, Owens received no other treatment for his malocclusion from the FCI.  Since leaving prison, Owens has been examined by several dentists and oral surgeons.  Dr. Cale, an orthodontist, testified by deposition that Owens should now receive a vertical ramus osteotomy and undergo at least one year of orthodontic treatment to correct Owens's misaligned jaw and the resulting malocclusion.  (See Cale dep. 25.)

## PROCEDURAL HISTORY

The plaintiff brings this claim pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.S. §§ 2671-2680, after adequately exhausting his remedies with the appropriate government agency and providing proper notice.  Owens alleges that he was not provided

---

[6]
An occlusal adjustment is a procedure where the enamel of a tooth is ground down to even out a malocclusion.  It is a relatively non-invasive procedure that is typically performed by a dentist rather than an oral surgeon.

adequate and timely medical care.[7]

Owens claims that he was denied adequate and timely treatment in contravention of 18 U.S.C. § 4042.[8]  Specifically, Owens argues that this statutory duty was breached by (1) the denial of the vertical ramus osteotomy, (2) the FCI's twelve day delay in taking a full x-ray of Owens's skull after Dr. Wise determined it was needed, (3) the lapse of time between the August 28, 2003 examination by Dr. Keen and when the BP 204 medical transfer was initiated on September 29, 2003, (4) the lapse of time between the October 27, 2003 denial of the BP 204 transfer and his December 3, 2003 examination by Dr. Ligon, and (5) the lapse in time between the December 3, 2003 examination and when the FCI's medical staff requested the results of Dr. Ligon's examination on January 13, 2004.  Owens requests damages for his out of pocket medical expenses incurred after he left the FCI, past pain and suffering, future medical expenses to fix his malocclusion, and lost wages for the time he will miss while having the vertical ramus osteotomy.

After the close of all the evidence, the Court met *in camera*

_____

[7]

While addressing the Court before trial, Owens's attorney denied having any medical malpractice claim against the United States; instead, Owens proceeded solely on a theory of negligence based on inadequate and untimely treatment.

[8]

18 U.S.C. § 4042 states, "[T]he Bureau of Prisons will have charge of the management and regulation of all Federal penal and correctional institutions and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States."

with counsel for both sides.  One issue which arose was whether Dr. Cale, as an orthodontist, possessed the requisite degree of expertise to recommend that Owens undergo oral surgery.  To quell these concerns, both sides agreed to submit the following issue to an independent expert: "Is Mr. Owens in need of a vertical ramus osteotomy now, which is three years after the injury, to reset his mandible or is orthodontic treatment and/or occlusal adjustment the preferred treatment?"

Both sides agree that Dr. David Sarver of Birmingham, Alabama possesses the cross-disciplinary expertise in dentistry, orthodontics, and oral surgery to provide such an opinion.[9]  On December 5, 2006, Dr. Sarver examined Owens.[10]  That same day, Dr. Owens informed the Court by letter of the results of his examination and his recommended treatment.  Dr. Sarver concluded that a combined treatment encompassing both surgery and orthodontics is needed to restore Owens's occlusion.

**LAW**

*Jurisdiction & Applicable Law*

---

[9]

Although Dr. Sarver is a practicing orthodontist who specializes in severe malocclusions, he is also a renowned researcher and an adjunct professor at the University of North Carolina.  Dr. Sarver has authored two orthodontic textbooks, including Esthetic Orthodontics and Orthognathic Surgery.

[10]

In a letter prior to the examination, the Court instructed Dr. Sarver not to discuss the case with Owens beyond those facts which Dr. Sarver deemed necessary to aid in making a proper diagnosis.

"The Federal Tort Claims Act grants the District Courts jurisdiction of civil actions against the United States 'for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" Hess v. United States, 361 U.S. 314, 317-18 (1960) (quoting 28 U.S.C. § 1346(b)).  There is no dispute that the FCI medical officers were acting within the scope of their employment when they allegedly denied the plaintiff adequate and timely treatment.  There is no dispute that the plaintiff has undertaken all prerequisite administrative action necessary to maintain this suit.  See 28 U.S.C. § 2675 (requiring claimants against the United States to present their claim to the appropriate administrative agency and receive a final disposition of the claim from such agency before bringing a lawsuit).  Therefore, jurisdiction over this action is proper.  Moreover, because the alleged acts and omissions occurred in Mississippi, the law of Mississippi will govern this action.

### *Mississippi Negligence Law*

A plaintiff must establish four elements to prove negligence: (1) the defendant owed to the plaintiff a duty, recognized by law, to conform to a certain standard of conduct; (2) a breach of that

duty;  (3)  a  reasonably  close  causal  connection  between  the
defendant's conduct and the resulting injury; and (4) actual loss
or damage to the plaintiff.  Carpenter v. Nobile, 620 So. 2d 961,
964 (Miss. 1993).  As previously mentioned, the Bureau of Prisons
has a statutory duty to provide inmates with adequate and timely
medical  treatment.  See  18 U.S.C. § 4042.  In performing this
duty, governmental employees must exercise "ordinary diligence" in
keeping  federal  prisoners  safe  from  harm.  Jones v. United States,
534 F.2d 53, 54 (5th Cir. 1976); Cowart v. United States, 617 F.2d
112, 116 (5th Cir. 1976).  Under this standard, federal prisoners
may recover against the government for injuries sustained during
confinement in prison so long as their damages were caused by the
negligence of a federal employee.  United States v. Muniz, 374 U.S.
150, 150 (1963).

## ANALYSIS

     The central issue in this case is whether the government
exercised ordinary diligence in its care of Mr. Owens.  First,
Owens claims that the multiple time lapses between treatments
amount to a breach of the government's duty to provide timely
treatment. Second, Owens alleges that he was not afforded adequate
and timely treatment since he never received any corrective
treatment for his broken jaw (or the resulting malocclusion) while
he was in the FCI's custody.

***The FCI's Delay in Performing an Adequate X-ray of Mr. Owens's Jaw***

The Yazoo City FCI's dental department is separate from the FCI's medical department. Dr. Wise testified that the FCI's dental department did not have the capacity to perform the type of x-ray which was necessary to reveal whether Owens had sustained a mandibular fracture. Dr. Wise also testified, however, that the medical department did possess the needed x-ray equipment. For that reason, on August 14, 2003 Dr. Wise instructed Owens to report to sick call the next morning for medical evaluation and additional x-rays. Dr. Wise never informed the FCI medical department, which conducted all non-dental x-rays, that Owens needed the x-rays. Although Owens reported to sick call on August 15 and was treated by Dr. Chambers, no x-rays were taken. In fact, additional x-rays were not taken until August 26, 2003, twelve days after Dr. Wise first noted the need for x-rays in order to make a proper diagnosis. Moreover, the August 26, 2003 x-rays were the result of Dr. Callahan's independent evaluation of Mr. Owens; Dr. Callahan **was never informed** by Dr. Wise that additional x-rays were needed. Dr. Callahan recognized the need to have further x-rays, which he ordered.

The Court finds that Dr. Wise failed to provide timely and adequate care for the plaintiff when he neglected to order additional x-rays. Dr. Callahan, however, recognized that additional x-rays were needed, and he contacted the radiologist and

Clinical Director, and the x-rays were taken.  Therefore, the Court finds that Dr. Wise failed in his duty to act with ordinary diligence in providing adequate treatment for Mr. Owens.

Furthermore, The Court finds that Dr. Wise's breach of duty caused Mr. Owens to endure pain for several months.[11]  Dr. Keen testified that if he had known about the subcondylar fracture within one week of the initial injury, the break could have been treated by wiring Owens's mouth shut.  (Keen dep. 51-52.)  Inasmuch as the jaw was allowed to begin the healing process while the bones were misaligned, Owens's malocclusion was not corrected and now requires the more invasive vertical ramus osteotomy recommended by Drs. Keen, Cale, and Sarver.  (See Cale dep. 25 (stating that Owens should undergo a combined treatment of a vertical ramus osteotomy and orthodontics); see also Sarver letter, December 5, 2006.)  Because of the mistreatment and negligence of Dr. Wise, Owens is injured, and the defendant is liable for those damages caused by said negligence.

***The FCI's Delay in Requesting Owens's Transfer to a Medical Facility***

Dr. Chambers testified that he filed a BP 204 request to transfer Owens to an FCI medical facility on September 29, 2003.

---

[11] The last record of Mr. Owens reporting pain to FCI medical personnel was on January 15, 2004.  (See Ex. D20.)

One full month earlier on August 28, 2003, Dr. Keen made Dr.
Chambers aware that this transfer was necessary for Owens to
undergo the vertical ramus osteotomy.  Dr. Chambers testified that
he agreed with Dr. Keen's assessment that the osteotomy was needed
to adequately treat Owens.  Dr. Chambers testified that he believed
the osteotomy was "necessary."  When asked by the plaintiff's
counsel on direct examination why he waited a full month before
completing the BP 204 transfer request, Dr. Chambers responded,
"I'm not sure."  The government never offered any justification for
this month-long delay.

     The Court finds Dr. Chambers's delay to be unreasonable.  On
the actual BP 204 transfer request, Dr. Chambers represented that
the osteotomy was "urgent."  Moreover, Dr. Chambers testified at
trial that he believed the treatment recommended by Dr. Keen was
both necessary and urgent, yet he waited a full month before taking
the appropriate steps to ensure that Owens would receive that
treatment.  Dr. Chambers failed to act with ordinary diligence by
waiting over a month to begin the process of providing Owens with
necessary treatment.  Therefore, the Court finds that Dr. Chambers
breached his duty to act with ordinary diligence in providing
timely medical treatment to Owens.

     The Court further finds that this delay caused Mr. Owens
damages.  According to Dr. Keen's testimony, time is of the essence
when treating a fractured jaw.  Had Dr. Chambers acted promptly in

filling out the transfer request, the entire process would have accelerated.   Therefore, even if Owens's transfer request was ultimately denied by the BOP, Owens would have been eligible for local treatment one month earlier.   As such, due to Dr. Chambers' unreasonable delay, Owens endured pain for no justifiable reason. Moreover, the two doctors who have most recently examined the plaintiff have both opined that a vertical ramus osteotomy is required to repair the plaintiff's malocclusion.   Accordingly, as a direct result of Dr. Chambers' negligence, the plaintiff will be forced to incur the expense of having this operation.

### *The FCI's Delay in Seeking Local Medical Treatment After the Medical Request Transfer Was Denied*

On October 27, 2003, the Bureau of Prisons denied Owens's medical transfer, and the Bureau directed Dr. Chambers to "pursue local treatment" for Owens's broken jaw.   (Ex. D20.)   Five weeks later on December 3, 2003, Dr. Chambers arranged for Owens to be examined by Dr. Ligon.   Although Dr. Chambers testified that he thought Owens would receive an osteotomy at the December 3, 2003 examination, no corrective treatment was performed.   During the examination, Dr. Ligon determined that surgery was not necessary; instead, he suggested an occlusal adjustment, which is a procedure generally performed by a general dentist rather than an oral surgeon.   Owens was returned to the FCI without receiving any treatment and without any written report or records from Dr. Ligon.

On January 13, 2004, after another six weeks had passed, Dr. Callahan contacted Dr. Ligon's office and requested a written report of Dr. Ligon's findings and recommendations made during the December 3, 2003 examination. After receiving this report on January 15, 2004, Dr. Callahan presented to Owens the option of having an occlusal adjustment. Owens refused.

Eleven weeks passed between the time the medical transfer was denied and the date Owens was offered corrective treatment. The Court finds that Dr. Chambers did not act with ordinary diligence by waiting five weeks before "pursuing local treatment." The Court further finds that Dr. Callahan breached his duty of diligence when he waited another six weeks before requesting the results of Dr. Ligon's examination. As such, both Drs. Chambers and Callahan were negligent by not providing timely local treatment to Owens. This delay in treatment directly caused the plaintiff to endure over two months of pain that he would not have suffered if he had been provided timely treatment.

**The FCI's Denial of Surgery**

After being struck in the jaw by a fellow inmate, Owens promptly reported the incident to FCI medical staff. Owens then remained in the custody of the FCI for ten months and received no medical treatment. That being said, it is true that Owens was offered the non-surgical option of an occlusal adjustment on

-14-

January 15, 2004.  Owens refused that treatment.  The Court must decide if the occlusal adjustment an was adequate treatment for Owens's broken jaw, which had healed in an anatomically incorrect position.

All of the expert testimony given in this case reveals that Owens had, and still has, a demonstrable malocclusion which he received as a result of the fracture to his jaw.  Three experts, including the independent expert agreed upon by the parties, have recommended that the plaintiff undergo surgery and post-operative orthodontics to correct Owens's jaw alignment and malocclusion. The government's expert, however, opined that surgery was unnecessary and could even worsen the plaintiff's condition.  After carefully weighing the conflicting expert testimony, the Court finds that the occlusal adjustment offered on January 15, 2004 was inadequate to fully correct the defendant's fracture.  Owens's fracture caused his jaw to be misaligned, resulting in an "open bite" or malocclusion.  Although an open bite can be repaired by an occlusal adjustment, such an adjustment would not have corrected the more serious problem of Owens's misaligned jaw.  Dr. Cale testified that a misaligned jaw, even where the teeth are in "wonderful occlusion," can cause the patient to suffer discomfort and headaches.  (Cale dep. 28-29.)

The denial of adequate treatment has caused Owens to suffer pain, especially while chewing, as recently as December 5, 2006.

-15-

(See Sarver letter (noting that Owens complained of pain during examination).)   Over three years have passed without Owens receiving any corrective treatment.   The surgery recommended by Dr. Sarver on December 5, 2006 is the same as that initially recommended by Dr. Keen on August 28, 2003.   If the FCI had made the initial surgery available to Owens in 2003, he would not have suffered discomfort and pain from his misaligned jaw for the past three years.[12]   Consequently, Owens will suffer out of pocket medical expenses as a result of being denied adequate treatment by the FCI.

**DAMAGES**

It is well-settled that "[i]n an action under the Federal Tort Claims Act, 28 U.S.C.A. § 1346(b), the law of the state where the cause of action arose 'is binding as to the measure of damages'." Simpson v. United States, 322 F.2d 688, 690 (5th Cir. 1963).   Under Mississippi law, Owens must prove his damages by a preponderance of the evidence.   Adams v. U.S. Homecrafters, Inc., 744 So. 2d 736, 740 (Miss. 1999).   Although the plaintiff need not prove the monetary value of his damages with absolute certainty, the extent of the damages sought must be proven with reasonable certainty which is sufficient "to remove [the measure of damages] from the

---

[12]

The Court is fully aware that the plaintiff would have suffered from post-operative pain and suffering; however, this pain would have been fleeting and not a continuing pain that would last indefinitely.

realm of mere speculation or conjecture." Evans v. Clemons, 872
So. 2d 23, 29 (Miss. Ct. App. 2003) (citing Adams v. U.S.
Homecrafters); Sentinel Indus. Contracting Corp. v. Kimmins Indus.
Serv. Corp., 743 So. 2d 954, 966-67 (Miss. 1999).  Moreover, Owens
is required to offer the best evidence available to support each of
his claims for damages. Puckett Mach. Co. v. Edwards, 641 So. 2d
29, 37 (Miss. 1994).  Owens seeks the following damages: (1) past
pain and suffering, (2) future medical expenses to fix his
malocclusion, (3) out of pocket medical expenses incurred after he
left the FCI, and (4) lost wages for the time he will miss while
having the vertical ramus osteotomy and recovering.

As to pain and suffering, the plaintiff has sufficiently
demonstrated that he endured pain which was caused by the FCI
medical personnel's negligence.  Had Owens been provided timely and
adequate treatment, he would have suffered for a shorter amount of
time.  Accordingly, the Court finds that the plaintiff is entitled
to $15,000.00.  Similarly, with regard to future medical expenses,
the plaintiff has proffered the testimony of an oral surgeon and an
orthodontist.  Both testified that the plaintiff is still in need
of some combination of surgery and orthodontics.  Dr. Sarver also
agrees that a combined treatment of surgery and orthodontics is
needed.  Moreover, Dr. Sarver informed the Court that the estimated

cost of such treatment is between $22,620.00 and $24,620.00.[13]   As such, the Court finds for the plaintiff in the amount of $23,620.00.

Less certainty, however, surrounds the next two items of damages.   In his closing argument to the Court, the plaintiff's attorney stated that Owens sought out of pocket medical expenses for his post-release dental visits.   The plaintiff's attorney stated that these expenses amounted to $2,100.00 and that proof of these expenses could be found in an exhibit to Dr. Cale's deposition, which was itself admitted into evidence at trial. After combing the Cale deposition, the Court was unable to find any reference to the fees paid by Owens.[14]   Therefore, the only evidence presented to the Court concerning out of pocket dental expenditures was the unsupported statement of Owens himself.   Owens testified that he saw three dental professionals with regard to his

---

[13]
Dr. Saver's February 19, 2007 letter itemized the costs as follows:

| Surgeon's fee (estimate) | $5,500.00 |
|---|---|
| Hospital fee (estimate) | $8,000.00 – $9,000.00 |
| Anesthesia (estimate) | $3,000.00 – $4,000.00 |
| Orthodontics | $6,120.00 |

[14]
Although none of the medical records attached to Dr. Cale's deposition contained the amount paid by Owens for the treatment received, some of the documents did have a section for the treating dentist to list the fee.   On each document, this section of the medical record was left blank.

malocclusion and fractured jaw.  Owens further testified that he

paid $2,100.00 for these professionals' services.  The plaintiff

did not, however, describe the nature or extent of any of these

dental visits.  Thus, the Court is presented solely with evidence

that Owens was examined by a dentist, an orthodontist, and an oral

surgeon.[15]  Owens has not satisfied his burden of establishing the

cost of these examinations with reasonable certainty; accordingly,

the plaintiff cannot recover the full $2,100.00.  Although he did

not prove the extent of his damages, the Court finds that Owens did

prove that he incurred some post-release medical expenses relating

to his fractured jaw.  A culpable defendant should not be allowed

to escape liability because the plaintiff failed to adequately

support his claim to damages with exacting accuracy.  MBF Corp. v.

Century Bus. Communications, Inc., 663 So. 2d 595, 599 (Miss.

1995).  The Court finds that the plaintiff has sufficiently shown

that he was examined at least three times regarding his fractured

jaw.  Moreover, each examination was conducted by a different

professional.  The Court therefore finds that Owens is entitled to

$300.00 for out of pocket medical expenses which were incurred

because of the government's negligence.

Owens also claims that he is entitled to lost wages for the

time he will miss while having the osteotomy and recovering from

---

[15]

The exhibits attached to Dr. Cale's deposition are sufficient to
show that Owens was examined by Dr. Wright, a dentist, Dr. Cale, an
orthodontist, and Dr. Holmes, an oral surgeon.

the osteotomy.  Owens, who is self employed as a contractor and builder, testified that he will be unable to work for four weeks after his surgery.  The plaintiff also stated that his monthly income is $12,500.00.  Even so, Owens failed to offer any evidence beyond his own testimony to show that he would be unable to work. Owens did not provide any demonstrative evidence to support his claim to lost wages.[16]  Moreover, the plaintiff never stated whether this was a "gross" figure or a "net" figure.  Inasmuch as the plaintiff's claimed monthly income is unsubstantiated, and the amount of time he will have to take off is unproven, an award of $12,500.00 would be nothing short of mere speculation on the part of the Court.  As such, Owens is not entitled to damages to lost wages.  If, within the time period allowed by the Federal Rules of Civil Procedure, the plaintiff can show how he is entitled to damages for lost wages, the Court will entertain a Motion for Reconsideration.

## CONCLUSION

For the reasons contained herein, *supra*, the plaintiff is entitled to have judgment entered on his behalf in the amount of $38,920.00.  Accordingly,

---

[16] Such documentation should have been readily available in the form of previous years' tax filings or bank records.

IT IS HEREBY ORDERED that judgment shall be entered in accordance with this opinion;

SO ORDERED, this the 30th day of March, 2007.

S/DAVID BRAMLETTE
UNITED STATES DISTRICT JUDGE